[No. A104367. First Dist., Div. Four. May 28, 2004.]

CITY OF MODESTO REDEVELOPMENT AGENCY et al., Petitioners, v. THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, Respondent, THE DOW CHEMICAL COMPANY et al., Real Parties in Interest.

## COUNSEL

Miller, Axline & Sawyer, Duane C. Miller, Michael D. Axline, A. Curtis Sawyer, Jr., Tracey L. O'Reilly, Tamarin E. Austin, Evan Eickmeyer and Daniel Boone for Petitioners.

No appearance for Respondent.

Beveridge & Diamond, Gary J. Smith, Alexia L. Beer, Mark A. Turco and Robert Brager for Real Party in Interest PPG Industries, Inc.

Filice Brown Eassa & McLeod, Gennaro A. Filice and Stephen J. Valen for Real Party in Interest The Dow Chemical Company.

Glynn & Finley, Patrick L. Finley and Adam Friedenberg for Real Party in Interest E.I. du Pont De Nemours and Company.

Barg Coffin Lewis & Trapp, Stephen C. Lewis and R. Morgan Gilhuly for Real Party in Interest Occidental Chemical Corporation.

·Wendel, Rose, Black & Dean, Christine K. Noma, Berger Kahn, Gene A. Weisberg and Melanie D. Long for Real Party in Interest Echco Sales and Equipment Co., Inc.

Brydon Hugo & Parker, Edward R. Hugo and Roland E. Thé; Law Offices of William W. Burns and William W. Burns for Real Party in Interest Goss-Jewett Company of Northern California.

Gordon & Rees, Roger M. Mansukhani and Kristin N. Reyna for Real Party in Interest American Laundry Machinery Inc., Cooper Industries.

Hamrick & Evans, A. Raymond Hamrick III, David L. Evans and Kenneth A. Hearn for Real Party in Interest M.B.L., Inc.

Farella Braun & Martel and James Colopy for Real Party in Interest Vulcan Materials Company.

Peterson, Wilka, Weyand & Martin and Benjamin P. Klatsky for Real Party in Interest Boewe Passat.

Peterson Weyand & Martin and Alexander M. Weyand for Real Party in Interest Bowe Permac, Inc., and Vic Manufacturing Company.

Foley Baron & Metzger, Richard S. Baron; Leach McGreevy & Labrador and Peter Labrador for Real Party in Interest Hoyt Corporation.

## OPINION

**RIVERA, J.**—This case comes to us on a petition for extraordinary relief after the trial court granted summary adjudication to defendants, manufacturers and suppliers of dry cleaning solvents and equipment. We are called on to decide whether the Polanco Redevelopment Act (Health & Saf. Code, § 33459 et seq.) (the Polanco Act) allows a local agency to recover the costs of cleaning up hazardous substances from parties that did not directly discharge wastes, control the site of the discharge, or have authority to prevent the discharge of those substances. We grant the petition and direct the trial court to reconsider the motions for summary adjudication in light of the views expressed herein.

### I.  BACKGROUND

The City of Modesto Redevelopment Agency brought an action against numerous defendants, alleging causes of action for strict liability, negligence,

negligence per se, continuing trespass, private and public nuisance, private and public nuisance per se, response costs and declaratory relief under the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.), ultrahazardous activity, and cost recovery under the Polanco Act (case No. 999345). The City of Modesto, along with the City of Modesto Sewer District No. 1, brought another action against a nearly identical group of defendants seeking damages for solvent contamination under many of the same legal theories; this action did not include a Polanco Act cause of action (case No. 999643).[1] The defendants included chlorinated solvent manufacturers, distributors of solvents and dry cleaning equipment, chlorinated solvent equipment manufacturers, and dry cleaning retailers. Before us on this petition are the trial court's rulings on the Polanco Act and negligence per se causes of action.

The complaints alleged that two cleaning solvents, perchloroethylene (PERC or PCE) and trichloroethylene, cause risks to health and the environment, that dry cleaners customarily dumped solvent wastewater into the public sewer systems, and that dry cleaners experienced a habitual problem of chlorinated solvents leaking into the environment. According to the complaints, the defendants who manufactured and supplied solvents and equipment instructed dry cleaners that chlorinated solvents could be discharged into sewers, and/or failed to issue recalls or warnings regarding the equipment and solvents.

The manufacturer and distributor defendants filed motions for summary adjudication of the Polanco Act and negligence per se causes of action.[2] The court granted summary adjudication on the Polanco Act cause of action to all but two of the moving defendants, concluding, among other things, that they neither discharged waste nor " 'cause[d] or permit[ted] any waste to be discharged . . . .' " (Wat. Code, § 13304, subd. (a).) On the negligence per se causes of action, the trial court granted summary adjudication to all but one of the moving defendants, concluding they did not dispose of PCE-containing products or wastes and did not exercise authority or control over the disposal

---

[1] For the sake of convenience, we will refer to the plaintiffs in the two actions collectively as the City.

[2] The motions regarding the Polanco Act were brought by a group of defendants known as the Solvent Manufacturers (The Dow Chemical Company, PPG Industries, Inc., Occidental Chemical Corporation, and E.I. du Pont de Nemours and Company); the Equipment Defendants (American Laundry Machinery, Inc., Bowe Permac, Inc., Cooper Industries, as successor in interest to McGraw Edison Company, Hoyt Corporation, and Vic Manufacturing Company, joined by R.R. Street & Company); Vulcan Materials Company (a solvent manufacturer); and the Distributor Defendants (Echco Sales & Equipment Co., Inc., joined by M.B.L., Inc., and Goss-Jewett Company of Northern California). These motions were heard on August 8, 2003. The motions regarding the negligence per se causes of action were brought by the Solvent Manufacturers, the Equipment Defendants (with the exception of R.R. Street & Company), and Vulcan Materials Company. These motions were heard on August 15, 2003.

of such products or wastes by any Modesto dry cleaner. Pursuant to Code of Civil Procedure section 166.1, the trial court expressed its belief that the motions involved a controlling question of law as to which there were substantial grounds for difference of opinion, and that appellate resolution of the issue of law might materially advance the conclusion of the litigation.

The City petitioned this court for a writ of mandate. On December 1, 2003, we issued an alternative writ of mandate, commanding the superior court to set aside its orders granting the motions for summary adjudication on the Polanco Act and negligence per se causes of action and enter a new order denying those motions, or show cause why it should not be compelled to do so. The superior court declined to set aside the orders "in order to receive additional guidance from the Court of Appeal on the relevant issues," and ordered the real parties in interest to show cause why the trial court should not be compelled to set aside the orders granting summary adjudication.[3]

## II. DISCUSSION

### A. *The Polanco Act*

■ The Polanco Act, enacted in 1990, authorizes redevelopment agencies to remediate contaminated properties within a project area. (*Redevelopment Agency of San Diego v. San Diego Gas & Electric Co.* (2003) 111 Cal.App.4th 912, 918 [4 Cal.Rptr.3d 317].) It provides in part that "if a redevelopment agency undertakes action to remedy or remove, or to require others to remedy or remove, . . . a release of hazardous substance, any responsible party or parties shall be liable to the redevelopment agency for the costs incurred in the action." (Health & Saf. Code, § 33459.4, subd. (a); see also *Redevelopment Agency v. Salvation Army* (2002) 103 Cal.App.4th 755, 770 [127 Cal.Rptr.2d 30] (*Salvation Army*).)

■ The Polanco Act defines a " '[r]esponsible party' " as "any person described in subdivision (a) of Section 25323.5 of [the Health and Safety Code] or subdivision (a) of Section 13304 of the Water Code." (Health & Saf. Code, § 33459, subd. (h).) Health and Safety Code section 25323.5 defines responsible parties as those described as covered persons in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9607(a)).[4] The City does not contend that the

---

[3] We will refer to the defendants who prevailed on the motions for summary adjudication as the prevailing defendants or simply as defendants.

[4] Title 42 United States Code section 9607(a) describes a covered person as "(1) the owner and operator of a vessel or a facility, [¶] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [¶] (3) any person who by contract, agreement, or otherwise arranged for disposal

prevailing defendants would be responsible under CERCLA. Instead, the issue here is whether the prevailing defendants are responsible parties under subdivision (a) of Water Code section 13304.[5]

The Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) (Porter-Cologne Act) provides in pertinent part: "Any person . . . who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts. . . ." (Wat. Code, § 13304, subd. (a).) The question before us is whether the trial court was correct in ruling that, as a matter of law, the prevailing defendants did not cause wastes to be discharged or deposited.

The trial court concluded the prevailing Solvent Manufacturers and Equipment Defendants were not responsible parties under Water Code section

or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and [¶] (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . ."

[5] We are mindful there is language in *Salvation Army* indicating that "responsible party" under the Polanco Act is limited to those enumerated as responsible parties under CERCLA. In *Salvation Army* the court cited Health and Safety Code section 33459.4, subdivision (c), which provides in part: "The scope and standard of liability for cost recovery pursuant to this section shall be the scope and standard of liability under [CERCLA] . . . ." Relying on this language, the court stated: "We construe that reference in the Polanco Act to CERCLA's scope of liability as simply incorporating CERCLA's definitions of who is liable for remedial costs." (*Salvation Army, supra,* 103 Cal.App.4th at pp. 765–766.) But this statement was not made in the context of a dispute over who was a responsible party; rather, it was made in the context of the court *rejecting* the defendant's contention that the Polanco Act had adopted certain federal procedural requirements: "[W]e construe the Polanco Act's reference to CERCLA's standard of liability as merely incorporating the liability standards applied by courts in CERCLA cases . . . . In doing so, we reject Army's contention that the Polanco Act adopted various procedural requirements of the national contingency plan as an element of a cause of action for recovery of costs under the Polanco Act." (*Id.* at p. 766.) In fact, the question of whether responsible parties under the Polanco Act were limited to those responsible under CERCLA did not arise at all in *Salvation Army*; the parties disputed only whether the defendant landowner remained a responsible party after the plaintiff redevelopment agency had taken over the property and removed certain contaminated waste. (*Id.* at pp. 770–771.) As has been noted, the Polanco Act on its face *does not* limit responsible parties to those enumerated in CERCLA. We therefore conclude that the cited language in *Salvation Army* is dictum (with which we disagree). We further note that neither the trial court nor defendants rely upon it to restrict the definition of "responsible party" under the Polanco Act.

13304 because the evidence showed they neither disposed of PCE-containing products or wastes nor exercised authority or control over the disposal of such products or wastes by any Modesto dry cleaner, and that the prevailing Distributor Defendants neither disposed of PCE waste in Modesto nor instructed, directed, or recommended that any Modesto-area dry cleaner dispose of chlorinated solvents on the ground or in the sewer. In explaining its ruling at the hearing on the motion, the trial court stated that in order for a party to "cause" a discharge for purposes of Water Code section 13304, "[Y]ou have to have some sort of physical control or the ability to stop it from happening."

The City argues the trial court erred in concluding that only those who directly participated in or exercised authority or control over on-site activities or disposal activities could be considered responsible parties under Water Code section 13304. According to the City, we should apply the traditional tort "substantial factor" test in determining who has caused a discharge for purposes of Water Code section 13304. The prevailing defendants, not surprisingly, defend the trial court's conclusion that a party must have the ability to control the discharge of waste to be liable under the Polanco Act.

■ "Well-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law. [Citation.] We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. [Citations.] These canons generally preclude judicial construction that renders part of the statute 'meaningless or inoperative.' [Citation.] In addition, words should be given the same meaning throughout a code unless the Legislature has indicated otherwise. [Citations.]" (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715–716 [3 Cal.Rptr.3d 623, 74 P.3d 726].) Where the words of a statute do not have a "plain meaning," statutory construction is necessary. (*Jacobs, Malcolm & Burtt v. Voss* (1995) 33 Cal.App.4th 1399, 1404 [39 Cal.Rptr.2d 774].) In interpreting a statute, "[c]ourts generally give great weight and respect to an administrative agency's interpretation of a statute governing its powers and responsibilities." (*Ibid.*) ■ Courts may also look to the legislative history in discerning the intent of the Legislature. (See *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 300–301 [250 Cal.Rptr. 116, 758 P.2d 58].)

Thus, we first ask, does the plain language of Water Code section 13304, subdivision (a) tell us who is a responsible party? The statute imposes liability on anyone who causes or permits a discharge or deposit of wastes;

however, it does not indicate whether "cause" refers to a party who was directly involved with a discharge, to anyone whose actions were a substantial factor in causing the discharge, or even, as city argued below, to anyone who places a hazardous substance into the chain of commerce.

In considering this issue, we are guided by *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605 [200 Cal.Rptr. 575] (*Leslie Salt*). There, Division Two of the First Appellate District considered whether a landowner on whose land fill had been placed, without the landowner's knowledge, could be required to remove the fill and be subjected to penalties under the McAteer-Petris Act (Gov. Code, § 66600 et seq.), as one who "has undertaken, or is threatening to undertake" unauthorized fill activity (Gov. Code, § 66638, subd. (a)). The court stated: "It needs to be emphasized at this point that the McAteer-Petris Act is the sort of environmental legislation that represents the exercise by government of the traditional power to regulate public nuisances. (*CEEED v. California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 318 [118 Cal.Rptr. 315] . . . .) Such legislation 'constitutes but "a sensitizing of and refinement of nuisance law." ' (*Id.*, at p. 319.) Where, as here, such legislation does not expressly purport to depart from or alter the common law, it will be construed in light of common law principles bearing upon the same subject. [Citations.]" (*Leslie Salt*, at pp. 618–619.)[6] Noting that under the common law, a landowner's liability for a public nuisance could result from the failure to act as well as from affirmative conduct, the court concluded that a landowner could be liable under the McAteer-Petris Act even if it was not actively involved in the condition that caused harm, and even if it did not know of or intend to cause such harm. (*Leslie Salt,* at pp. 619, 622.) This liability could include both responsibility to obey a cease and desist order, and civil fines on a per-day basis for violating the order. (*Id.* at p. 618.)

The Porter-Cologne Act similarly appears to be harmonious with the common law of nuisance. Water Code section 13304, subdivision (a) authorizes cleanup or abatement orders against a person who "has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and *creates, or threatens to create, a condition of pollution or nuisance* . . . ." (Italics added.) The Porter-Cologne Act defines " '[n]uisance' " to mean "anything which meets all of the following requirements: [¶] (1) Is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable

---

[6] The court in *CEEED* stated: "Contemporary environmental legislation represents an exercise by government of this traditional power to regulate activities in the nature of nuisances . . . ." (*CEEED v. California Coastal Zone Conservation Com., supra,* 43 Cal.App.3d at p. 318.)

enjoyment of life or property. [¶] (2) Affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. [¶] (3) Occurs during, or as a result of, the treatment or disposal of wastes." (Wat. Code, § 13050, subd. (m).) The first two paragraphs of this definition track relevant portions of the language of Civil Code sections 3479 and 3480, which define nuisance and public nuisance. The third paragraph establishes that the Porter-Cologne Act regulates only nuisances that are connected with the treatment or disposal of wastes. Thus, it appears that the Legislature not only did not intend to depart from the law of nuisance, but also explicitly relied on it in the Porter-Cologne Act.

■ Having concluded that the statute must be construed "in light of common law principles bearing upon the same subject" (*Leslie Salt, supra,* 153 Cal.App.3d at p. 619)—here the subject of public nuisance—we turn next to identify those principles. It has long been the law in California that " '[n]ot only is the party who maintains the nuisance liable but also the party or parties who create or assist in its creation are responsible for the ensuing damages.' " (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1137 [281 Cal.Rptr. 827].) Thus, courts have upheld as against a demurrer a nuisance claim founded upon allegations that defendants disposed of hazardous substances on property during their lease, but at the time of the action did not have a possessory interest in the property (*id.* at pp. 1132–1133, 1137); and on allegations that defendant soils engineer prepared a plan for slope repair on a neighboring property which, when constructed, caused water, mud, and debris to flow onto the plaintiff's property (*Shurpin v. Elmhirst* (1983) 148 Cal.App.3d 94, 100–101 [195 Cal.Rptr. 737]). Similarly, a nonsuit on plaintiff's cause of action for nuisance was reversed where the evidence showed defendant contractor dumped fill on a street, interfering with drainage and causing the plaintiff's property to be flooded. (*Portman v. Clementina Co.* (1957) 147 Cal.App.2d 651, 654, 659–660 [305 P.2d 963].) And the Supreme Court has held that a defendant who obstructs a private road can be liable for nuisance, irrespective of whether he claims any interest in the land over which the plaintiff claimed a right of way. (*Hardin v. Sin Claire* (1896) 115 Cal. 460, 462–463 [47 P. 363].) In sum, liability for nuisance does not hinge on whether the defendant owns, possesses or controls the property, nor on whether he is in a position to abate the nuisance; the critical question is whether the defendant created or assisted in the creation of the nuisance. (*Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 343 [23 Cal.Rptr.2d 377].)

While liability for nuisance is broad,[7] however, it is not unlimited. *City of San Diego* established one important limitation. There, the city brought an action on various theories, including nuisance, against defendants who manufactured, distributed or supplied asbestos-containing building materials, alleging asbestos had contaminated city buildings and seeking recovery for, among other things, money the city spent to identify and abate the asbestos danger. (*City of San Diego, supra,* 30 Cal.App.4th at pp. 578–579.) The Court of Appeal concluded the city could not maintain an action based on nuisance, stating, "City cites no California decision . . . that allows recovery for a defective product under a nuisance cause of action. Indeed, under City's theory, nuisance 'would become a monster that would devour in one gulp the entire law of tort . . . .' (*Tioga Public School Dist. v. U.S. Gypsum* (8th Cir. 1993) 984 F.2d 915, 921.)" (*Id.* at p. 586.) The court also noted that other jurisdictions considering the issue had not allowed plaintiffs to recover on a nuisance theory for defective asbestos-containing building materials. (*Ibid.,* citing *Tioga Public School Dist. v. U.S. Gypsum, supra,* 984 F.2d at pp. 920–921, *Detroit Bd. of Educ. v. Celotex Corp.* (1992) 196 Mich.App. 694 [493 N.W.2d 513, 520–522], *Town of Hooksett School Dist. v. W.R. Grace Co.* (D.N.H. 1984) 617 F.Supp. 126, 133, *Johnson County, Tenn. v. U.S. Gypsum Co.* (E.D.Tenn. 1984) 580 F.Supp. 284, 294 [stating that allowing such a nuisance action " 'would convert almost every products liability action into a nuisance claim' "].) The court concluded this was "a products liability action in the guise of a nuisance action" (*City of San Diego, supra,* 30 Cal.App.4th at pp. 586–587), and affirmed summary judgment in favor of the defendants (*id.* at p. 590).

We agree with *City of San Diego* that the law of nuisance is not intended to serve as a surrogate for ordinary products liability.[8] In light of that conclusion, the question we face here is whether the Polanco Act claims

---

[7] As stated in *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, 585 [35 Cal.Rptr.2d 876] (*City of San Diego*), "Nuisance has been described as an 'impenetrable jungle.' (Prosser & Keeton, Law of Torts (5th ed. 1984) § 86, p. 616.) '[Nuisance] has meant all things to all people, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition.' (*Ibid.,* fns. omitted.)"

[8] We are aware that some courts have concluded an action for nuisance may be maintained against manufacturers, distributors, and dealers of guns on the theory that they created, participated in, or facilitated the flow of guns into a market that targeted illegal gun purchasers. (See, e.g., *Ileto v. Glock Inc.* (9th Cir. 2003) 349 F.3d 1191, 1209–1215; *Cincinnati v. Beretta U.S.A. Corp.* (2002) 95 Ohio St.3d 416 [2002 Ohio 2480, 768 N.E.2d 1136, 1142–1144]; *Gary ex rel. King v. Smith & Wesson, Corp.* (Ind. 2003) 801 N.E.2d 1222, 1231–1234, and cases cited therein.) Our research reveals no California state cases holding such defendants liable for causing a nuisance. In any event, the theory in those cases was not that the products were defective or that the defendants failed to warn of their dangers. (See *Ileto v. Glock Inc., supra,* 349 F.3d at p. 1213, fn. 29 [distinguishing *City of San Diego* on ground that action against gun defendants was not " 'a products liability action in the guise of a nuisance action' "].)

fall within the realm of nuisance or of products liability; stated another way, has city presented evidence that the defendants assisted in the creation of a nuisance, or only that they produced or supplied defective products?

We look first to *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601 [271 Cal.Rptr. 596] (*Selma*), which applied the law of nuisance to a similar case. There, the State of California and the Regional Water Quality Control Board (collectively, the State) sued the defendants, operators of a wood treatment facility, alleging they improperly disposed of hazardous waste and seeking, among other things, damages flowing from a nuisance. (*Id.* at pp. 1606, 1608.) The defendants cross-complained, seeking equitable indemnity from several cross-defendants. One was a company that designed the wood treatment technique, installed cross-complainants' equipment, provided training and made recommendations on operating policies that resulted in wood-treating chemicals being deposited into soil overlying an aquifer. Other cross-defendants included chemical suppliers that provided "assistance and advice" and knew or should have known of the potential health threats posed by improper use or disposal of the chemicals, but failed to warn of those risks. (*Id.* at pp. 1607, 1609.)

The Court of Appeal concluded the cross-complainants had pled, or could plead, facts showing the cross-defendants might be liable for the nuisance—specifically, that the installer of the equipment recommended creation of an unlined dirt pond for disposing of the waste products; that it knew or should have known that such disposal could threaten the safety of the water supply; that the cross-complainants did not know of the danger; and that the installer failed to warn of that danger. The court reasoned that this kind of direct involvement in the design and installation of the disposal system, coupled with the installer's knowledge and the user's lack of knowledge of the dangers, could support a finding that the designer/installer created or assisted in the creation of a nuisance. (*Selma, supra,* 221 Cal.App.3d at p. 1620.)

The involvement of the chemical companies was less direct, but the court concluded they, too, could be held liable. The cross-complaint alleged: as direct purchasers of the chemicals, the owners (cross-complainants) were foreseeable users; disposal of the chemical residue was a foreseeable use of the product; the chemical companies knew or should have known of the dangers of improper disposal of the chemicals; the owners did not know of those dangers; the companies failed to warn of the dangers; and that failure to warn was a substantial factor in causing the damage. (*Selma, supra,* 221 Cal.App.3d at pp. 1621–1624.)

We agree with the first stated conclusion in *Selma*—that those who create or assist in creating a system that causes hazardous wastes to be

disposed of improperly, or who instruct users to dispose of wastes improperly, can be liable under the law of nuisance. Here, for example, the City claims that, with knowledge of the hazards involved, some of the defendants instructed the dry cleaners to set up their equipment to discharge solvent-containing wastewater into the drains and sewers, and that others gave dry cleaners instructions to dispose of spilled PERC on or in the ground. We conclude that these kinds of affirmative acts or instructions could support a finding that those defendants assisted in creating a nuisance, and therefore would defeat a summary adjudication motion on the Polanco Act cause of action.

Defendants argue the circle of liability should be drawn more tightly, pointing out that the only parties the State Water Resources Control Board (State Board) has held liable for penalties or cleanup costs were those that controlled either the discharge activity or the premises where the discharge occurred. (See, e.g., *In re Exxon Company, U.S.A.* (Order No. WQ 85-7, Aug. 22, 1985) 1985 Cal. ENV LEXIS 10 at pp. *15–18 (Cal.St.Wat.Res.Bd.) [oil company and gasoline distributor not properly named where there was no reasonable evidence they owned gasoline tanks that leaked]; *In re Spitzer* (Order No. WQ 89-8, May 16, 1989) 1989 Cal. ENV LEXIS 11 at pp. *6–12 (Cal.St.Wat.Res.Bd.) [landowners who know of discharge on their property and have sufficient control of the property to correct it are subject to a cleanup order]; *In re Stuart* (Order No. WQ 86-15, Sept. 18, 1986) 1986 Cal. ENV LEXIS at pp. *6–13 (Cal.St.Wat.Res.Bd.) [lessee of property did not cause discharge under Wat. Code § 13304, but he permitted it because he had legal power to stop the contamination].) While *In re Exxon* does suggest that a party who merely *supplies* a hazardous substance is not responsible under Water Code section 13304, the authorities defendants rely on are of limited value in assessing the responsibility of a party that *instructs* users to dispose of hazardous wastes in an unsafe manner or a party that *creates* a system that would result in improper disposal of hazardous wastes. Furthermore, the State Board has concluded that even a relatively minor contribution to a discharge may support a finding of responsibility. For instance, in *In re County of San Diego* (Order No. WQ 96-2, Feb. 22, 1996) 1996 Cal. ENV LEXIS at p. *14 (Cal.St.Wat.Res.Bd.), the State Board ruled that the Regional Water Quality Control Board had properly treated a city as a discharger, solely because the city had an easement over and authority to control a street that overlay part of a landfill, and subsidence of landfill material beneath the roadway was contributing to runoff coming from the street to the landfill surface, which in turn was adversely affecting water quality beneath the site.

Thus, we disagree with defendants' contention that only those who are physically engaged in a discharge or have the ability to control waste disposal activities are liable under section 13304. In harmony with *Selma*, we

think a reasonable fact finder might conclude that defendants who manufactured equipment designed to discharge waste in a manner that will create a nuisance, or who specifically instructed a user to dispose of wastes in such a manner, could be found to have caused or permitted a discharge.

With respect to *Selma*'s second stated conclusion—the potential liability of defendants who fail to warn of the dangers of improper disposal of hazardous materials but give no guidance or instructions pertaining to that disposal—we face a more difficult question. In this case the involvement of certain defendants was limited to manufacturing or selling solvents to dry cleaners, with knowledge of the hazards of those substances, without alerting the dry cleaners to proper methods of disposal. The City's theory that these suppliers should be held liable is similar to that proffered by the plaintiff in *City of San Diego*: "City claims the manufacturer of an allegedly defective product can be liable in nuisance . . . because '[t]he stream of commerce can carry pollutants every bit as effectively as a stream of water.' " (*City of San Diego, supra,* 30 Cal.App.4th at pp. 584–585.) As did the court in *City of San Diego,* we reject this contention.

Here, any failure to warn was not an activity directly connected with the disposal of solvents. In our view, such behavior is analogous to the manufacture, distribution, and supplying of asbestos-containing materials in *City of San Diego*; it does not fall within the context of nuisance, but is better analyzed through the law of negligence or products liability, which have well-developed precedents to determine liability for failure to warn. (See, e.g., *Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1110 [56 Cal.Rptr.2d 162, 920 P.2d 1347]; *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995–1003 [281 Cal.Rptr. 528, 810 P.2d 549]; *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830, 835 [71 Cal.Rptr.2d 817].)[9]

---

[9] The *Selma* court's reasoning in holding the supplier-defendants potentially liable is not entirely clear. As noted, in *Selma* the state sued the defendants who discharged hazardous waste alleging a cause of action for nuisance. The defendants cross-complained against their codefendants—among them, their chemical suppliers—for equitable indemnity. (*Selma, supra,* 221 Cal.App.3d at pp. 1606–1607.) Recognizing that an equitable indemnity claim requires the cross-defendants to have potential joint and several liability to the *plaintiff,* the Court of Appeal posed the question "whether the pleadings adequately plead . . . facts which suggest . . . the chemical suppliers created or assisted in the creation of the nuisance here." (*Id.* at p. 1620.) However, in answering the question, and holding cross-complainants could state a claim against the chemical suppliers, the court relied solely upon a classic negligence/failure to warn theory. (*Id.* at pp. 1621–1624.) We therefore read *Selma* to mean that a defendant sued in nuisance and subjected to liability for nuisance damages, may cross-complain against codefendants or third parties under other appropriate theories, such as products liability or failure to warn. If *Selma* is interpreted as holding that one who merely supplies a product and fails to warn of the hazards of improper disposal can be liable under the law of nuisance, we would disagree with it.

Thus, construing Water Code section 13304, subdivision (a) "in light of the common law principles bearing upon [nuisance]" (*Leslie Salt, supra,* 153 Cal.App.3d at p. 619), we conclude that those who took affirmative steps directed toward the improper discharge of solvent wastes—for instance, by manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly—may be liable under that statute, but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable under that section of the Porter-Cologne Act.

We have reviewed the legislative history of the relevant portions of the Polanco Act and the Porter-Cologne Act, and see nothing inconsistent with this result. Indeed, the legislative history of the "causes or permits" language in a different provision within the Porter-Cologne Act, Water Code section 13350, supports our conclusion that the Legislature did not intend the act to impose liability on those with no ownership or control over the property or the discharge, and whose involvement in a discharge was remote and passive. The phrase "causes or permits" was added to the statute in 1971, in an amendment providing civil penalties for those who, among other things, caused or permitted waste or oil to be discharged into the waters of the state. (Stats. 1971, ch. 668, § 1, p. 1322; see Stats. 1969, ch. 482, § 18, p. 1070.) The Department of Finance enrolled bill report stated, "Effects of this bill would be (1) waste dischargers would be more careful in their operations and (2) some funds would be provided for cleanup of anonymous oil spills." (Cal. Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 225 (1971 Reg. Sess.) Aug. 12, 1971.)

Water Code section 13350 was again amended in 1980, to authorize imposition of civil liabilities on "[a]ny person who, without regard to intent or negligence, causes or permits" a discharge of hazardous substances into the waters of the state. (Stats. 1980, ch. 877, § 3, p. 2754.) The statute also provided there would be no liability if the discharge were caused by events beyond the discharger's control, including any "circumstance or event which causes the discharge despite the exercise of every reasonable precaution to prevent or mitigate the discharge." (*Id.* at p. 2755.) An enrolled bill report on this revision stated: "This bill would provide a higher standard of liability for anyone who discharges a reportable quantity of a hazardous substance in or on the State's waters where it creates a condition of pollution or nuisance. . . . [¶] . . . [¶] The imposition of this higher standard of care will provide a greater incentive for hazardous waste handlers to avoid spills." (Cal. Environmental Quality Agency, Enrolled Bill Rep. on Assem. Bill No. 2823 (1979–1980 Reg. Sess.) Sept. 5, 1980, pp. 1–2.) Thus, it appears section 13350 was intended to encourage hazardous waste handlers to be careful in their operations and to avoid spills. Persons who had no active involvement in activities leading to a discharge do not appear to fall into this category.

▮ Two other provisions within the Porter-Cologne Act are also instructive. Water Code section 13271, subdivision (a)(1) requires any person who "without regard to intent or negligence, causes or permits" any hazardous substance to be discharged on the waters of the state, to notify the Office of Emergency Services as soon as possible after that person has knowledge of the discharge. Failure to do so is a misdemeanor, punishable by a fine or imprisonment for not more than one year. (*Id.*, subd. (c).) Water Code section 13272, subdivisions (a) and (c) make it a misdemeanor for one who causes or permits a discharge of oil or petroleum products into the waters of the state to fail to notify the Office of Emergency Services as soon as possible after having knowledge of the discharge. A Department of Fish and Game report stated that section 13271 would "require[] a spiller of a hazardous substance, with certain exceptions, to immediately notify the Office of Emergency Services of such a spill . . . ." (Cal. Dept. of Fish & Game, Rep. on Assem. Bill No. 2823 (1979–1980 Reg. Sess.) May 2, 1980.) A bill analysis prepared by the Department of Conservation indicated that section 13272 would "require any person in charge of a vessel or facility to report a spill as soon as possible," and that "the penalty provisions set forth in AB 2281 should provide adequate incentive for a spiller to promptly report such an incident." (Cal. Dept. of Conservation, Analysis of Assem. Bill No. 2281 (1981–1982 Reg. Sess.) Nov. 10, 1981, p. 1.) Thus, we see no indication the Legislature intended the words "causes or permits" within the Porter-Cologne Act to encompass those whose involvement with a spill was remote and passive.

In light of the ongoing nature of this case, and the trial court's familiarity with the parties and the evidence, we will leave it to the trial court to apply the standards articulated in this decision to the facts in the first instance. The trial court is directed to reconsider the motions for summary adjudication of the Polanco Act cause of action in accordance with the views expressed herein.[10]

## B.  *Negligence Per Se*

The City also challenges the trial court's action in granting summary adjudication of the negligence per se causes of action. These causes of action allege violations of seven statutes: Water Code sections 13050, subdivision (m), 13350, and 13387; Health and Safety Code sections 5411, 5411.5, and 117555; and Fish and Game Code section 5650. In its briefing before this court, however, the City analyzes only Water Code section 13350. We will

---

[10] In reaching our conclusion, we do not limit any other remedies available to either the City or to any party who is held liable for the cleanup. In fact, this case includes causes of action for negligence and strict liability, which remain to be tried. Nothing in this ruling is intended to affect those causes of action.

not consider the other alleged statutory violations. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785 [79 Cal.Rptr.2d 273] [point not supported by reasoned argument and citations to authority is treated as waived].)

Water Code section 13350, subdivision (b)(1), a part of the Porter-Cologne Act, makes liable any person who "causes or permits any hazardous substance to be discharged in or on any of the waters of the state . . . ." The City argues that the substantial factor test for causation should be used to determine whether defendants caused a hazardous substance to be discharged in violation of this statute. Our views regarding the meaning of the words "causes or permits" in the Porter-Cologne Act are fully explained above, and we need not repeat them here. The trial court is directed to reconsider the motions for summary adjudication of the negligence per se causes of action based on Water Code section 13350 in light of the views expressed herein.

## III. DISPOSITION

Let a writ of mandate issue directing the superior court to vacate and set aside its orders of October 17, 2003, granting the prevailing defendants' motions for summary adjudication on the Polanco Act and negligence per se causes of action, and further directing the superior court to reconsider the motions for summary adjudication in accordance with the views expressed herein. The City of Modesto Redevelopment Agency, the City of Modesto, and the City of Modesto Sewer District No. 1 shall recover their costs on appeal.

Kay, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied June 28, 2004, and the opinion was modified to read as printed above. The petition of real party in interest Hoyt Corporation for review by the Supreme Court was denied September 15, 2004. Chin, J., did not participate therein.